UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JAMES GLASS,                        )
                                    )
            Plaintiff               )
                                    )
        v.                          )   Case No. 2:05 cv 136
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security     )
                                    )
            Defendant               )

OPINION AND ORDER

    This matter is before the court on the Motion for Summary
Judgment or Remand filed by the plaintiff, James Glass, on August
26, 2005.  For the reasons set forth below, this motion is
**DENIED.**

Background

    The plaintiff, James Glass, applied for Disability Insurance
Benefits ("DIB") on September 4, 2002, alleging a disability
onset date of February 3, 2001 due to high blood pressure,
nerves, and anxiety. (Tr. 18, 53-54)  The Social Security Admin-
istration ("SSA") initially denied Glass' application on April
28, 2003, and again upon consideration on August 27, 2003. (Tr.
14-15) Glass requested a hearing before an Administrative Law
Judge ("ALJ") on September 15, 2003, and a hearing was held
before ALJ Daniel Dadabo on May 26, 2004.  (Tr. 25, 168) Subse-
quent to the hearing in which Glass and Vocational Expert ("VE")
Grace Gianforte testified, ALJ Dadabo denied Glass' application
by written decision on July 16, 2004.  (Tr. 5-10)  Following a

denial of his request for review by the Appeals Council on July 16, 2004, Glass filed his complaint in this court on June 28, 2005. (Tr. 1)

As a preliminary matter, the court must clarify the proper use of evidence offered in previous disability determinations  in Glass' case. Glass previously applied for DIB on April 26, 2001, alleging a disability onset date of February 8, 2001. While ALJ William J. Wilkin's denial of benefits on the first application was pending before this court, Glass filed the second application for benefits now on appeal here.  Two months after ALJ Dadabo issued his decision on the second application, this court af-firmed ALJ Wilkin's decision on the first application.  (2:02 CV 431, DE 21)  Despite the pending appeal of the first application at the time of his opinion, ALJ Dadabo correctly noted that the period under review on the second application began April 12, 2002, the day after ALJ Wilkin issued his opinion. (Tr. 5)

In his decision denying benefits, ALJ Dadabo twice acknow-ledged ALJ Wilkin's decision in Glass' first application for benefits. (Tr.6, 9) Nevertheless, he reached his disability determination on the evidentiary record as a whole (both then and now), rather than through reliance on Wilkin's prior findings with respect to that evidence. (Tr. 6-9) Glass takes issue with the Commissioner's position that 1) ALJ Wilkin's decision has *res judicata* effect insofar as Glass' disability status through April 11, 2002 and 2) that ALJ Dadabo could consider the evidence be-fore ALJ Wilkin in determining that the evidence before Dadabo

2

was "merely cumulative." (Response Brief, p. 9) Glass is incorrect.

It cannot be disputed that *res judicata* binds Glass from relitigating ALJ Wilkin's determination that Glass was not disabled as of April 11, 2002. *See* 42 U.S.C. §405(h)("The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing.). *See also* **Groves v. Apfel**, 148 F.3d 809, 810 (7th Cir. 1998); **Rucker v. Chater**, 92 F.3d 492, 494 (7th Cir. 1996); **Abendroth v. Barnhart**, 26 Fed. Appx. 580, 584 (7th Cir. 2002).  In addition, collateral estoppel "may bar the relitigation of issues essential to the second claim as well." **Groves**, 148 F.3d at 810.  For example, a claimant who lost an arm - a definitive, non-progressive disability - may be barred from relitigating whether the loss excluded him from substantial gainful activity.  However, a progressive condition necessitates review of the total record. *See* **Groves**, 148 F.3d at 810-11; **Rucker**, 92 F.3d at 495.  As a general rule, ALJ Dadabo is not barred from considering the <u>evidence</u> before ALJ Wilkin on Glass' first application in reaching a disability determination on Glass' second application. *See* **Groves**, 148 F.3d at 810 ("[A]lthough the final judgment denying [the first] application was *res judicata*, this did not render evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding."); **Rucker**, 92 F.3d at 495 ("[T]he second ALJ properly

3

based his findings on the administrative record as a whole.");
**Abendroth**, 26 Fed. Appx. at 584.

The exception to this general rule is that "[t]he 'readmission' of that evidence is barred only if a finding entitled to collateral estoppel effect establishes that the evidence provides no support for the current claim," such as "if the earlier evidence had been found unworthy of belief." ***Groves***, 148 F.3d at 811. Consequently, ALJ Dadabo may be barred from relying on ALJ Wilkin's <u>finding</u> that the prior opinions of Glass' treating physicians were not entitled to controlling weight in the first decision to conclude that the later opinions of the same physicians are invalid now.  However, he may look at the prior medical <u>evidence</u> provided in support of Glass' first application for benefits (in combination with subsequent evidence) to hold that the new opinions provided by those physicians are not entitled to weight.  As stated above, Glass does not claim that ALJ Dadabo acted inappropriately in this respect, and so that argument is waived. Glass does not contend that ALJ Dadabo incorrectly applied ALJ Wilkin's <u>findings</u> as a form of *res judicata*, and so he has waived any arguments on this basis. *See **Pelfresne v. Village of Williams Bay***, 917 F.2d 1017, 1023 (7th Cir. 1990). ALJ Dadabo was entitled to reach the conclusion that the evidence Glass provided in support of the current claim is "merely cumulative of the prior record." (Tr. 9) In other words, ALJ Dadabo is entitled to conclude that the new evidence is simply "more of the

same" and does not show any change in Glass' condition since his first application.

With these principles in mind, the facts as set forth in this court's November 30, 2004 decision in cause number 2:02 CV 431 denying Glass' first application for DIB are incorporated in this decision.  Glass' new evidence is as follows:

In June or July 2000, Glass' family physician, whose notes are not in the record, referred Glass to psychologist Sankar Jayanchandran after Glass complained of anxiety and substance abuse following a dispute with his wife and session of binge drinking. (Tr. 184) Dr. Jayachandran treated Glass in monthly or bi-monthly sessions from June or July 2000 through January 2004. (Tr. 185)  The notes from Dr. Jayachandran submitted with Glass' first application for benefits showed a "reduction in Glass's alcohol usage, . . . consistently reported that Glass was anxious and depressed, . . . and also indicated that Glass was eating well and had no side effects from his medications." (November 30, 2004 Opinion, pp. 5-6)

On April 4, 2002, Dr. Jayachandran completed a Mental Residual Functional Capacity Assessment ("RFC") in which he described Glass as "markedly limited" in every aspect of under-standing and memory, concentration and persistence, and social interaction with the exception of the ability to remember loca-tions and work-like procedures, which Dr. Jayachandran described as "moderately limited." (Tr. 138) He further diagnosed Glass with an Affective Disorder, with disturbance of mood as evidenced

by a depressive syndrome characterized by anhedonia, appetite disturbance with change in weight, and sleep disturbance. (Tr. 141) Dr. Jayachandran concluded that Glass had slight restrictions in Activities of Daily Living ("ADL"), marked difficulty maintaining social functioning, and constant deficiencies of concentration, persistence, or pace. (Tr. 145)

In an Adult Disability Report filed with his application for benefits on September 4, 2002, Glass stated that he was disabled due to high blood pressure, nerves, and anxiety. (Tr. 87)

In an ADL questionnaire completed October 8, 2002, Glass said that he lived with his sons, who cooked his meals. (Tr. 104) He did not do any household chores, never had the desire to go shopping, needed help remembering to take his medications and keep appointments, and did not care if he performed personal grooming. (Tr. 104) He described problems losing his train of thought, stated that he seldom left home, slept only short periods of time, and did not socialize because he was not interested in what other people were doing. (Tr. 105-06) He sometimes drove, fixed things, watched television, talked to neighbors or on the phone, and managed his finances. (Tr. 106)

On March 19, 2002, Glass visited Dr. Savio Manett, who assessed Glass with hypertension, nicotine addiction, decreased libido, and anxiety and depression. (Tr. 129) Dr. Manett continued Glass on Cardizem, Viagra as needed, and Aspirin once a day, and advised him to quit smoking. (Tr. 129)

On November 22, 2002, Dr. Jayachandran completed a one page

6

form stating that Glass had Major depressive disorder-Rule out
bipolar II disorder, and alcohol dependence that was being
treated with Trileptal, Celexa, and Revia. (Tr. 137) He further
stated that Glass had "been incapacitated since Feb 2001 and
unable to return to work." (Tr. 137)

On December 4, 2002, psychologist Alan Long evaluated Glass
on behalf of the Disability Determination Bureau. (Tr. 147-50)
During the evaluation, Dr. Long noted that Glass' "posture, gait,
manners, etc. were within normal limits." (Tr. 147) Glass told
Dr. Long that he had a very high tolerance for alcohol, had high
blood pressure and had become a "nervous wreck," and had worked
for over 30 years in the steel mill until he was asked to take an
indoor computer job. (Tr. 147; *See also* 2:02-cv-431, Tr. 188,
205-16)  He also told Dr. Long that he got along well with others
but did not like to be around crowds.  (Tr. 148) He also de-
scribed a lot of anxiety and stated that he did not "want to face
the possibility that I might be depressed." (Tr. 148)

Upon examination, Dr. Long found that Glass was fully
oriented, could repeat six digits forward and five in reverse,
"was able to subtract sevens from 100 accurately and rapidly,"
and otherwise had an unremarkable examination. (Tr. 148) Dr. Long
opined that Glass met the criteria for Alcohol Dependence and
found that based on Glass' testimony, Glass was in the early
stages of partial remission. (Tr. 148) Dr. Long also found that
Glass met the criteria for a Depressive Disorder-Not Otherwise
Specified, but that it was "difficult to tell if his depression

7

is the result of his work situation, his alcohol dependence, or other factors." (Tr. 148) Finally, Dr. Long found that Glass could manage his own funds, had an average ability to understand and carry out instructions, got along well with others, and had trouble adjusting to changes in his job description and with customary work pressures.  (Tr. 148)

On January 7, 2003, Dr. Terry Travis completed a Psychiatric Review Technique for the DDB based on the evidence of record. (Tr. 151-57) Dr. Travis found that Glass had a nonsevere affective disorder and substance addiction disorder as evidenced by disturbance of mood, but he concluded that the impairment did not precisely meet any of the typical criteria for the disorder. (Tr. 153) He also concluded that Glass had mild restrictions of daily living and mild difficulties maintaining concentration, persistence, and pace.  (Tr. 156) In reaching this PRT, Dr. Travis noted that Glass portrayed himself as much more impaired in his ADL reports than he presented to Dr. Long. (Tr. 157)

On March 21, 2003, Glass returned to Dr. Manett with an enlarged prostate and problems urinating.  (Tr. 128) Dr. Manett's assessment of Glass also included hypertension, nicotine addiction, hypercholesterolemia, and urine retention. (Tr. 128) Dr. Manett prescribed Flomax. (Tr. 128)

On April 21, 2003, Dr. Vidya Madala completed a Physical RFC for Glass on behalf of the DDB. (Tr. 165) Based on the evidence of record, Dr. Madala concluded that Glass could lift 50 pounds occasionally, lift 25 pounds frequently, stand and/or walk and

8

sit about six hours in an eight hour day each, and had unlimited
ability to push and/or pull. (Tr. 159) She otherwise found no
limitations. (Tr. 160-64) She further noted that as of his latest
visit to Dr. Manett, Glass was successful in treating his hyper-
tension with medication. (Tr. 165)

Glass visited Dr. Jayachandran three times between April 29
and August 14, 2003 for individual sessions and once for a group
session. (Tr. 166-67) In his individual visit on April 29, Glass
reported that he had been drinking beer for two days but had been
sober for a week.  He denied suicidal ideation but complained of
depression. (Tr. 167) The notes from the group session and
remaining two individual sessions dealt exclusively with alcohol
addiction. (Tr. 166-67)

On May 8, 2003, Glass completed a Reconsideration Disability
Report in which he stated that his depression was worsening, that
he did not visit with friends or go out, and that he no longer
had the drive to do household chores. (Tr. 109-10) He said that
he took care of his personal needs. (Tr. 110)

On July 9, 2003, Glass completed a second ADL Questionnaire.
(Tr. 114-17)  He stated that he still lived with his sons and
helped them with yard work when they did it, typically ate two
meals a day cooked by his son or girlfriend, and would forget to
pay his bills on time.  (Tr. 114-15) He also stated that he got
angry when people told him what to do. (Tr. 116) His ADLs other-
wise were no different than in October 2002, except that he now
"often" watched television or listened to the radio, sometimes

9

drove, but claimed he rarely or never did other activities. (Tr. 116)

During the ALJ hearing on May 26, 2004, Glass testified that he was 5'6" and 160 pounds. (Tr. 186) He described his typical day as getting up, drinking coffee, watching television, sitting in the yard, eating, and taking a nap. (Tr. 186-87) He doubted that he could concentrate well enough to perform his old job and further opined that he did not think he could take the stress of a regular schedule because, when he was working, he would start to shake after two hours. (Tr. 186, 189) His girlfriend drove him from Illinois to Tennessee every six weeks to see his mother. (Tr. 188) His girlfriend also primarily did his laundry, and his son cooked for him. (Tr. 188-89) Glass testified that he did not care about anything anymore. (Tr. 190)  He also testified that he had "a little bit" of problems with his memory, had to be re-minded to do things, and could barely concentrate. (Tr. 192, 197) He did not leave the house other than to go to his girlfriend's house once or twice a week or to go to the store for cigarettes. (Tr. 197-98) He had not looked for a job because he did not feel he could handle it. (Tr. 199)

Following Glass' testimony, VE Gianforte testified that Glass' previous jobs were skilled and required medium exertion. (Tr. 204-05) In response to a hypothetical for a person of Glass' educational and work background, who had an average ability to understand and carry out simple work instructions, got along well with people but did not like crowds, and needed to work at his

10

own pace, VE Gianforte concluded that this person would have a
moderate to significant adjustment to work.  (Tr. 206-07) VE
Gianforte further explained that a person of advanced age and who
was accustomed to skilled work, but who now was limited to un-
skilled work under the hypothetical, would have their confidence,
self-esteem, self image, and psychological well being challenged.
(Tr. 208-09) The ALJ next asked, if he must discount VE Gian-
forte's opinion regarding the impact of adjustment from skilled
to unskilled work at an advanced age, what types of jobs a person
with the described limitations could perform. (Tr. 210) VE Gian-
forte stated that this person could perform 30,000 jobs as a
stock material mover, 5,000 jobs as off-bearers or machine feed-
ers, and 5,000 jobs as a packer. (Tr. 211)  Next, in response to
a hypothetical which included the "marked" limitations described
in Dr. Jayachandran's November 22, 2002 RFC, VE Gianforte stated
that Glass would be precluded from all employment. (Tr. 212)

In his decision denying disability benefits on July 16,
2004, ALJ Dadabo noted that Glass was not performing substantial
gainful activity at Step One and that he had a severe impairment
at Step Two, but that it did not meet a Listing at Step Three.
(Tr. 6) Specifically, he found that Glass had severe impairments
of "alcohol dependence in partial remission, anxiety, depression,
hypertension and hypercholesterolemia." (Tr. 7)

In reaching this conclusion, the ALJ noted that ALJ Wilkin
found Glass to have a severe adjustment disorder with anxiety and
alcohol dependence in early claimed remission on April 11, 2002.

11

(Tr. 6) He further stated that while Dr. Jayachandran "listed a
Major depressive disorder, rule out Bipolar disorder, and alcohol
dependence . . . , his progress notes refer only to episodes of
drinking . . . and not to any other psych condition."  (Tr. 7) By
contrast, examining physician Dr. Long found Glass to have
alcohol dependence in partial remission and that Glass met the
criteria for Depressive Disorder-not otherwise specified.  Dr.
Long also "did not perceive any mental condition that would
affect the claimant's ability to understand and carry out in-
structions or to get along with others, but commented that the
claimant has had trouble with customary work pressures and
adjusting to changes." (Tr. 7) In addition, treatment notes from
Glass' two visits to Dr. Manett indicate that one year passed
between the two visits and that Glass' blood pressure was within
normal limits on both occasions. (Tr. 7) Finally, PRT forms
completed by DDB non-examining physicians on January 7, 2003 and
August 21, 2003, stated that Glass did not have a severe mental
impairment. (Tr. 7) In RFCs completed April 4, 2003 and August
21, 2003 respectively, Dr. Travis and Dr. Madala both concluded
that Glass had a severe medical impairment of high blood pressure
affected by anxiety. (Tr. 7)

Based on the above evidence, ALJ Dadabo rejected Dr. Jaya-
chandran's April 1, 2002 RFC determination in favor of the expert
opinions of the non-examining state agency consultants Dr. Travis
and Dr. Madala. (Tr. 7) In support of his decision, ALJ Dadabo
explained that Glass had not seen Dr. Jayachandran since January

2004, five months prior to the hearing date, and that Glass only
had seen Dr. Jayachandran monthly for alcohol group counseling
and medication check-up. (Tr. 7) The RFC completed by Dr. Jaya-
chandran actually had been completed prior to ALJ Wilkin's first
decision denying benefits. (Tr. 9)  Moreover, Glass testified
that his only prescribed psychotropic medication was Trileptal,
samples provided by Dr. Jayachandran. (Tr. 7) He also had not
provided any new evidence, no clinical findings, and no mental
status reports from Dr. Jayachandran other than the 2002 RFC to
support the doctor's conclusions. (Tr. 7-8) ALJ Dadabo also found
the RFC to be inconsistent with Glass' own testimony: whereas Dr.
Jayachandran described Glass to have marked social restrictions,
Glass testified that he saw his girlfriend regularly and travel-
led with her every six weeks to Tennessee. (Tr. 8) Thus, the ALJ
found Dr. Jayachandran's opinions to be conclusory. (Tr. 8)

At Step Four, ALJ Dadabo adopted the RFC of Drs. Madala and
Travis, including the "capacity to lift and/or carry 25 pounds
frequently and 50 pounds occasionally, to stand and/or walk about
six hours in an eight hour workday, and to sit about six hours in
an eight-hour workday." (Tr. 8) He also found "[n]o postural,
manipulative, visual, communicative, or environmental limita-
tions." (Tr. 8) Based on these reports, ALJ Dadabo concluded that
Glass could perform a "full range of medium work, subject to
moderate restrictions necessitating a flexible pace that would
accommodate the need to avoid crowds and line-driven performance

13

expectations and subject to an average ability to attend simple
work instructions." (Tr. 8)

The ALJ further found that Glass was not credible in the
degree of impairment he claimed. (Tr. 8) ALJ Dadabo noted that
despite Glass' "self-serving" statements that he could not
concentrate well enough to do a job and needed to take three
Neurontin a day to stay on task, he performed his last job
"exceptionally well, notwithstanding a heavy pattern of alcohol
use." (Tr. 8) Glass further admitted that he had been reassigned
to a different job at the end of his career because of a person-
ality conflict, but he also testified that with the exception of
stress, he still could handle the work physically. (Tr. 8)
Finally, ALJ Dadabo noted that despite Glass' lack of medication
at the ALJ hearing, Glass still had a "warm, outgoing, familiar,
responsive, and cooperative" demeanor, was very suntanned, and
had an ongoing relationship with his girlfriend despite claims of
self-isolation. (Tr. 8)

Although the ALJ found Glass unable to perform his previous
work at Step Four, he concluded that Glass still could perform
the 40,000 jobs described by VE Gianforte during the hearing.
(Tr. 9) He also rejected VE Gianforte's statements that adjust-
ment from medium skilled work to unskilled work would be "signif-
icant because of psychological stressors." (Tr. 9) The ALJ
explained that VE Gianforte "conceded the issue was not one of
capacity." (Tr. 9) In addition, ALJ Dadabo noted, "Unskilled work
does not involve the transference of skills to the processes,

14

tools and industry of other work.   Therefore, *unsubstantiated* issues of self-esteem, confidence and self-image are not relevant as non-exertional obstacles of competitive work." (Tr. 9)

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.   42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003).   Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* ***Consolidated Edison Company v. NRLB***, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002).   An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002).   However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

15

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act   The claimant must show that he is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b).  If he is, the claimant is not disabled
and the evaluation process is over; if he is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
§404.1520(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of his past work.  If, at this fourth step,

16

the claimant can perform his past relevant work, he will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Glass' first argument in support of remand is that ALJ Dadabo erroneously assessed his mental abilities because the ALJ neglected to follow SSR 96-8p and did not give controlling weight to the opinion of his treating physician, Dr. Jayachandran. Glass states that the ALJ's unfavorable RFC determination was the product of an inappropriate analysis whereby the ALJ acknowledged or "cherry picks" only the evidence that is adverse to the plain- tiff's claim.  Additionally, Glass maintains that the ALJ's fail- ure to obtain a medical expert to assess his symptoms in the record equates to the ALJ "playing doctor."  Specifically, Glass claims that the ALJ's rejection of Dr. Jayachandran's findings in favor of consultative examining State agency physician Dr. Travis, is erroneous.

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

17

not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2).  *See also* **Gudgell v. Barnart**, 345 F.3d 467, 470 (7th Cir. 2003); **Books v. Chater**, 91 F.3d 972, 979 (7th Cir. 1996) (*quoting* **Stephens v. Heckler**, 766 F.2d 284 (7th Cir. 1985)) (holding that with respect to conflicting opin-ions of a treating and a consultive physician, "the ALJ must take into account the treating physician's ability to observe the claimant over a long period.").

In addition, if the ALJ bases his rejection of a treating physician's opinion on the grounds that it lacks support, the ALJ must "solicit additional information to flesh out an opinion for which the medical support is not readily discernable." **Barnett v. Barnhart**, 381 F.3d 664, 669 (7th Cir. 2004). However, the ALJ need not recontact the source unless the existing evidence is "inadequate to determine whether the claimant is disabled." **Skerbek v. Barnhart**, 105 Fed. Appx. 836, 839 (7th Cir. 2004). *See also* 20 C.F.R. §404.1512(e).  Whether to recontact a treating source is within the discretion of the ALJ.  *See* **Skarbeck**, 105 Fed. Appx. at 839.

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight.  20 C.F.R. §404.1527(c)(2); **Clifford v. Apfel**, 227 F.3d 863, 871 (7th Cir. 2000)  Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony.  *See, e.g.,* **Latkowski v.**

18

*Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004).

Here, ALJ Dadabo's decision to discount Dr. Jayachandran's RFC determination is logical, fully explained, and well-supported. As the ALJ noted, there is no evidence from either Glass' previous application for benefits or this application that Dr. Jayachandran treated Glass for more than alcohol dependency. (Tr. 7) At no point in time has Glass produced any records from Dr. Jayachandran showing that he conducted a mental status evaluation or made any clinical findings to support the severity of the limitations he described. The ALJ further noted that Dr. Jayachandran's descriptions of asocial behavior were inconsistent with the plaintiff's own testimony, which showed that he maintained a relationship with his girlfriend, that he visited her at least two times a week at her house, that he entertained her at his own house, and that he traveled with her to Tennessee on a regular basis. (Tr. 197-98) Finally, the ALJ observed that the only psychotropic medication Glass was taking at the time of the hearing was samples of Trileptal, yet he still appeared relaxed, cooperative, and social during the hearing. (Tr. 7-8) Given this evidence, the court cannot say that the ALJ improperly discounted Dr. Jayachandran's opinions.

The court further notes that Dr. Jayachandran's April 1, 2002 RFC supplied in support of this application for benefits is nearly a duplicate of Dr. Jayachandran's April 2, 2002 RFC that ALJ Wilkin rejected in 2:02 cv 431. (*See* 2:02 cv 431, Tr. 19,

19

158-167)  This court upheld ALJ Wilkin's decision finding Glass
not disabled as of April 11, 2002, and Glass has not appealed.
Glass otherwise has produced virtually no new medical evidence in
support of his second application for benefits, now before the
court, beyond (1) a few notes about alcohol treatment during four
visits to Dr. Jayachandran and (2) two notes showing normal blood
pressure and some complaints about an enlarged prostate (not the
basis of his disability claim) from visits to Dr. Manett. Under
these unique facts, Glass' attempt to argue that ALJ Dadabo erred
in discounting Dr. Jayachandran's April 1, 2002 RFC, identical to
and completed one day <u>before</u> the RFC in 2:02 CV 431 but - for
whatever reason - not included in the record of that case,
appears to be an attempt to use the claim process to obtain a
second bite of the apple.

    Glass next argues that the ALJ erroneously discounted his
credibility based on his ability to perform life activities like
visiting his girlfriend.  The ALJ must determine Glass' credibil-
ity after considering all of his symptoms "and the extent to
which [his] symptoms can reasonably be accepted as consistent
with the objective medical evidence." 20 C.F.R. §404.1529(a).  If
Glass' impairments reasonably could produce the symptoms of which
he was complaining, the ALJ next must evaluate the intensity and
persistence of the symptoms through consideration of his "medical
history, the medical signs and laboratory findings, and state-
ments from [his] treating or examining physician or psychologist,
or other persons about how [his] symptoms affect [him]." 20

C.F.R. §404.1529(c)(1).  If the symptoms Glass described were not supported by the objective medical evidence, "the ALJ must obtain detailed descriptions of [Glass'] daily activities by directing specific inquiries" about the symptoms and their effect on him. *Clifford*, 227 F.3d at 871 (*quoting* *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). However, the ALJ "need not totally accept or totally reject [Glass'] statements." SSR 96-7p, at *4. Rather, the ALJ can make a determination, based on the totality of the evidence, that Glass' statements were  credible only to a certain degree.  SSR 96-7p, at *4.

While Glass' complaints of disability cannot be based on symptoms totally unfounded in medical findings, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also* *Idoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  In addition, the ALJ must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2.  *See* *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th

Cir. 1995)).  The court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Jens*, 347 F.3d at 213; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  Furthermore, the ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

The ALJ's decision to discount Glass' credibility is supported by the substantial evidence.  Glass tries to characterize this case as one in which the ALJ unfairly found he could function based on his ability to perform some limited tasks, arguing that Dr. Jayachandran showed him to have "marked limitations" in many areas.  This court already has upheld ALJ Dadabo's rejection of Dr. Jayachandran's opinions.   During the relevant period, Glass generally saw Dr. Jayachandran only once a month, and the only notes from those appointments show treatment for alcohol addiction.  (Tr. 7) In addition, Glass' performance during the examination with Dr. Long was mainly normal, and Dr. Long's diagnosis and opinions were incorporated into the ALJ's ultimate RFC. (Tr. 148)

But more problematically, Glass' appearance at the ALJ hearing was inconsistent with his extreme allegations of inability to function.  At the time of the hearing, he was taking

22

samples of only one medication to manage his alleged mental
condition. (Tr. 7) He also left the house several times a week to
be social with his girlfriend, and he took lengthy road trips
with her on a regular basis to see his mother. (Tr. 8) Finally,
he presented with a "warm, outgoing, familiar, responsive, and
cooperative demeanor." (Tr. 8) Given the complete lack of medi-
cal evidence supporting the severity of Glass' alleged condition,
the court cannot say that the ALJ erred in comparing Glass'
testimony to his own observations of Glass during the hearing.
The court further notes that ALJ Dadabo did not entirely discount
Glass' testimony, but he adjusted his RFC to include a flexible
pace, work away from crowds, and an average ability to attend to
simple instructions. (Tr. 8)

     Glass' third argument in support of remand is that ALJ
Dadabo inappropriately rejected the VE's favorable opinion.  More
specifically, plaintiff argues that ALJ Dadabo arbitrarily
rejected the VE's testimony which stated that subjective stress-
ors upon the claimant would create too much of a work adjustment
for the claimant to engage in unskilled work.  In doing so,
plaintiff argues that ALJ Dadabo engaged in "result-oriented
justice" by dismissing the VE's favorable opinion without any
substantial evidence to the contrary.

     An ALJ is entitled to discredit the testimony of a voca-
tional expert.  *See **King v. Barnhart***, 66 Fed. Appx. 65, 70 (7th
Cir. 2003).  As the Court of Appeals has explained, "[A] voca-
tional expert is not a required or even essential part of a

23

disabilitiy benefits hearing. The decision whether to employ the services of a vocational expert is entirely within the discretion of the ALJ." *See **Ehrhart v. Secretary of Health and Human Services***, 969 F.2d 534, 540 (7th Cir. 1992).  Furthermore, the ALJ may reject the opinion of the VE when the VE relied upon evidence that the ALJ rejected. *See **Edwards v. Sullivan***, 985 F.2d 334, 339 (7th Cir. 1993).  Further, the ALJ is not required to give an explanation for his rejection of the VE's testimony when substantial evidence exists to support the ALJ's decision. *See **King***, 66 Fed. Appx. at 70.

Glass has not provided any law in support of the contention that an ALJ is required to follow a VE's opinion that psychological stressors would make a transition to unskilled work difficult after the VE has admitted that those stressors do not impact the capacity of a claimant to perform the unskilled work.  (Tr. 208) Furthermore, the ALJ explained that he rejected the VE's testimony because it was speculative and based on stressors totally unsupported by the evidence. (Tr. 9) In any event, contrary to Glass' position, the VE did not testify that the transition from skilled to unskilled work would mean that no jobs in significant numbers were available.  Rather, the VE testified that because the transition from skilled to unskilled work can be an adjustment, a vocational expert often assists the person, and that VE Gianforte had helped people successfully make the change. (Tr. 210)

24

Finally, Glass argues that ALJ Dadabo failed to evaluate Glass' mental RFC properly because he did not incorporate specific mental limitations such as the ability to understand, carry out, and remember simple instructions, to make work-related decisions, to respond to supervision, coworkers, and work situations, and to manage change in the workplace into his hypotheticals to the VE.  Glass also alleges that the ALJ failed to consider his quality of daily activities, his ability to sustain activity over a period of time, and level of intellectual functioning.  This argument is totally without merit.

The ALJ considered the RFCs completed by both Dr. Travis and Dr. Jayachandran, which included all of the areas outlined above in addition to Glass' testimony and all of the other available evidence. In the hearing, the ALJ also specifically asked Glass about his experience in his previous job and reasons for leaving (which included testimony on the length of time Glass was able to sustain work), about his daily activities, his social functioning, and his memory and concentration.  (Tr. 178-99) As a practical matter, the ALJ does not need to include each of these elements in his hypotheticals to the VE if the ALJ finds that no impairment exists.  Moreover, the ALJ specifically incorporated the limitations found by Dr. Long into his hypotheticals including Glass' preference to avoid crowds, an average ability to understand and carry out instructions, and trouble adjusting to changes in his job and difficulty with customary work pressures. (*Compare* Tr. 148 *and* Tr. 206-07) With the exception of Dr.

25

Jayachandran, no other doctor proposed additional or different limitations.  To the extent Glass argues the court should have followed Dr. Jayachandran's RFC, Glass simply reiterates his argument with respect to the RFC of his treating physician, already rejected by this court.

_____

For the foregoing reasons, the Motion for Summary Judgment or Remand filed by the plaintiff, James Glass, on August 26, 2005 is **DENIED**. The determination of the commissioner of Social Security is AFFIRMED.

ENTERED this 18th day of September, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge

26